## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

NORTHSTAR ENERGY LLC,
a Delaware limited liability company,                    Case No. 12-

                Plaintiff,                              Hon.

v.

ENCANA CORPORATION,                         **JURY TRIAL DEMANDED**
a Canadian corporation, and

ENCANA OIL & GAS USA INC.,
a Delaware corporation, and

CHESAPEAKE ENERGY
CORPORATION,
an Oklahoma corporation, and

O.I.L. NIAGARAN, LLC,
a Michigan limited liability company,

                Defendants.
_____/

Brian J. Masternak (P57372)
Charles N. Ash, Jr. (P55941)
Lance R. Zoerhof (P63980)
David R. Whitfield (P73352)
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
bmasternak@wnj.com
cash@wnj.com
lzoerhof@wnj.com
dwhitfield@wnj.com
616.752.2000
Attorneys for Plaintiffs
_____/

## COMPLAINT FOR DAMAGES

Plaintiff, NorthStar Energy LLC, for its complaint against Defendants, Encana Corporation, Encana Oil & Gas USA Inc., Chesapeake Energy Corporation and O.I.L Niagaran, LLC (collectively **"Defendants"**), states as follows:

## BACKGROUND AND PARTIES

1.      This is an action for damages under the Sherman Act, the Michigan Antitrust Reform Act, and the common law of Michigan.

2.      NorthStar Energy LLC ("**NorthStar**") owns private working interests in a number of properties in northern Michigan. In early June of 2010, NorthStar put out for bid approximately 9,838 net mineral acres of oil and gas leases in the following northern Michigan counties:  Antrim, Charlevoix, Cheboygan, Montmorency, Kalkaska and Otsego.  Those leases included the mineral rights allowing the exploration and development of the Utica/Collingwood shale formations.

3.      NorthStar offered its mineral interests for bid amid heightened demand for oil and gas leases in northern Michigan counties due to promising reports earlier in 2010 of a Utica/Collingwood commercial test well that was drilled by Petoskey Exploration, an affiliate of Defendant Encana Corporation ("**Encana**"), in Missaukee County, Michigan.

4.      That demand resulted in highly competitive bidding over leases offered by the State of Michigan at the May 4, 2010 state lease auction.  Competition at the lease sale produced record-breaking bonus prices for oil and gas leases.  Around the time of the auction, several potential buyers contacted NorthStar expressing interest in acquiring NorthStar's oil and gas leases, which could be used to explore and/or drill the Utica/Collingwood shale formations.  Included in the group of potential buyers interested in NorthStar's acreage were Defendants

Encana Oil & Gas USA Inc. (**"Encana USA"**) and O.I.L. Niagaran, LLC (**"OILN"**), both of which contacted NorthStar about its leases in or around April and May of 2010.

5.      Encana USA is a Delaware corporation with its principal place of business and headquarters located at 370 17th Street, Suite 1200, Denver, Colorado 80202. It serves as the entity responsible for the United States operations of Encana. Encana is a Canadian natural gas and oil company with its principal place of business located at 1800, 855 2 Street S.W., Calgary, Alberta T2P 2S5.

6.      OILN is a Michigan limited liability company with its principal place of business located at 954 Business Park Drive, Suite 5, Traverse City, Michigan 49686. OILN is the entity that was responsible for acquiring leases in northern Michigan, including NorthStar's acreage, on behalf of Defendant Chesapeake Energy Corporation (**"Chesapeake"**). Chesapeake is an Oklahoma oil and gas company with its principal place of business located at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

7.      It is now known that, in their efforts to acquire oil and gas leases for exploitation of the Utica/Collingwood shale formations from NorthStar and other private leaseholders, Encana and Chesapeake – from as early as June of 2010 – formed an anti-competitive agreement and shared competitive and proprietary information in violation of the Sherman Act with the primary purpose of depressing prices for Utica/Collingwood oil and gas leases, and extracting other favorable terms related to Encana's and Chesapeake's acquisition of Utica/Collingwood oil and gas leases.

8.      Encana and Chesapeake's agreement illegally restrained trade in several ways. This included Encana agreeing with its supposed competitor, Chesapeake, to refrain from bidding for NorthStar's acreage, thus eliminating competition and artificially lowering the price

terms available to NorthStar and other leaseholders. The illegal agreement enabled Chesapeake and Encana to enter into deals with NorthStar and others, obligating such landowners, including NorthStar, to sell their acreage to either Chesapeake or Encana at prices below what a competitive market would bear. Another way in which this agreement restrained trade was by the sharing of competitive and proprietary information between Chesapeake and Encana, which gave each even more, artificially obtained leverage. They used wrongfully obtained leverage and bargaining power to renege on prior agreements to acquire Utica/Collingwood acreage.

9.     As part of their agreement, Chesapeake and Encana entered into the above-referenced deals with landowners and locking them into deals to sell a substantial amount of acreage in the pertinent northern Michigan counties. They were then able to wrongfully foist upon the subject leaseholders one-sided modifications to those agreements, without the typical and potential consequence in a competitive market of having one's primary competitor acquire such leases.

10.     In NorthStar's case, the lack of competition produced by the agreement and information sharing between Chesapeake and Encana provided OILN and Chesapeake with artificially increased bargaining power and, as described below, resulted in NorthStar agreeing to sell a portion of its acreage to OILN/Chesapeake at price terms substantially below the true market value of those leases. It also provided OILN/Chesapeake the leverage to subsequently delay closing on the parties' agreement and ultimately foist upon NorthStar the option-to-purchase provision (described below) in the parties' Purchase and Sale Agreement (**"PSA"**), which generally allowed OILN/Chesapeake to buy less acreage than it originally had agreed to buy at even further depressed price terms in lieu of closing on the PSA.

11.     Defendants conspired to restrain trade and depress prices, willfully violating federal and state antitrust laws, with the primary goal of avoiding and/or preventing competition and thereby artificially lowering the price for or eliminating NorthStar's ability to sell its acreage.

12.     When the prices for Utica/Collingwood leases in northern Michigan were drastically depressed in October of 2010, Chesapeake relied on the wrongfully obtained, completely one-sided option-to-purchase provision of the PSA to effectively renege on its agreement with NorthStar – robbing NorthStar of the already deflated purchase price for its leasehold acreage and allowing Chesapeake to acquire 750 Utica/Collingwood acres at even further depressed prices.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

13.     The amount in controversy exceeds $75,000.

14.     This Court has personal jurisdiction over Defendants because all Defendants had systematic and continuous contacts with and otherwise conducted business in this district.

15.     This Court has jurisdiction over Counts I and II of this Complaint, which assert violations of Section 1 of the Sherman Act (15 U.S.C. § 1), pursuant to 15 U.S.C. §§ 15 and 26. *See* 28 U.S.C. § 1331.

16.     This Court has supplemental jurisdiction over Counts III through VI of this Complaint because these state law claims are so interrelated to NorthStar's federal law claim that they form the same case or controversy.  *See* 28 U.S.C. § 1367(a).

17.     Defendants Chesapeake and Encana are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.  Encana is a Canadian corporation which does business

in the United States through its U.S. affiliates, such as Encana USA, located in Colorado. As reported by Encana, from 2008 to 2010, Encana spent over $37 million acquiring approximately 250,000 net acres in Michigan. **Exhibit A,** Encana Press Release dated May 7, 2010. Chesapeake is an Oklahoma corporation with representative companies in multiple states, including OILN in Michigan. Chesapeake has publically stated that it "has invested approximately $400 million to acquire leases in Michigan." **Exhibit B,** Bloomberg article dated June 26, 2012, p. 2.

18. In addition to the leases reportedly acquired by Chesapeake and Encana, both of these out-of-state companies have made, and will continue to make investments in and affecting oil and gas leases in Michigan. For example, as Encana has detailed, Encana's 2012 drilling plan, was initially "estimated to cost $36.5 million, [and] translates to . . . local purchases and hiring of contractors and their employees in central Michigan. Any gathering or other production facilities would be in addition to these expenditures, and would inject even more money into the central Michigan economy." **Exhibit C**, Prefiled Direct Testimony of Russell Kimmitt on behalf of Encana Oil & Gas (USA) Inc., MPSC Case No. U-16999, September 20, 2012, p. 11. In addition to Encana's out-of-state investments, Encana believes that additional investments in Michigan will occur "by other oil and gas producers who will follow Encana's lead in developing their production areas in central Michigan . . ." *Id.*

19. Moreover, the acquisition and development of oil and gas leaseholds in northern Michigan has a substantial effect on commerce outside of Michigan. For instance, both Chesapeake and Encana brought in landmen from outside Michigan to investigate and acquire the Utica/Collingwood leases. Upon information and belief, Chesapeake and Encana relied on money transferred from or financed by out-of-state banks to acquire such leaseholds. Moreover,

Chesapeake and Encana relied on out-of-state companies to drill the wells on the acquired leaseholds (as Encana and Chesapeake did to drill exploratory Utica/Collingwood wells). Upon information and belief, they also used out-of-state companies to evaluate prospective oil and/or gas wells.

20.     Furthermore, Chesapeake and Encana transport oil and/or gas products out of Michigan through interstate and international pipeline systems. Encana's Utica/Collingwood wells, already or in the near future, connect to the MichCon pipeline system, which interconnects with a natural gas pipeline system reaching from Wisconsin to Maine. Additionally, oil, natural gas, or natural gas liquids obtained from the Utica/Collingwood shales in northern Michigan would almost certainly be offered for sale outside of Michigan through the introduction of those products into this pipeline system. Alternatively, if such oil, natural gas, or natural gas liquids are not sold outside of Michigan, the proceeds of those sales would still affect interstate commerce as the sale proceeds would be returned to Encana or Chesapeake, both of which are located outside of Michigan.

21.     Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because a substantial number of the events giving rise to this Complaint, and the effect of those events, occurred and will impact oil, natural gas, and energy concerns located in this district.

## BACKGROUND FACTS

**A.      Speculation and Heightened Demand for Northern Michigan Oil & Gas Leases.**

22.     In 2010, NorthStar held oil and gas rights to thousands of acres in northern Michigan.

23.     These oil and gas rights included the rights to explore and drill for oil or gas from the Utica/Collingwood shale formations, deep mineral formations not previously recognized as having commercial viability in northern Michigan.  The Collingwood shale is an oil and natural gas producing formation which lies roughly 5,000-7,000 feet below northern Michigan.  The thickness of the Collingwood shale varies over northern Michigan.  The Utica shale formation is a thicker formation which lies immediately below the Collingwood shale.

24.     The oil and gas industry began to recognize the commercial viability of the Utica/Collingwood shales in early 2010, based on reports from the field that an exploratory well drilled in the Utica/Collingwood shales in Missaukee County, Michigan, was visibly flaring gas. Both of these formations are now thought to be commercially productive formations for oil, natural gas, and natural gas liquids.

25.     On April 24, 2010, that speculation heightened even further when the results of the initial flowback tests on the State Pioneer 1-3 well, an exploratory Utica/Collingwood shale well drilled in Missaukee County, Michigan, became public and indicated that the Utica/Collingwood shales may present a commercially viable oil and natural gas play. Eventually, it was disclosed that Encana, through a related company, was the entity that drilled the State Pioneer 1-3 well.

26.     Unlike in the case of the shallow and well exploited Antrim formation in northern Michigan, expensive advanced drilling technologies and techniques are needed to exploit the Utica/Collingwood formations.  The technologies needed to reach and produce these formations include deep horizontal drilling techniques and extensive hydraulic fracturing technologies.  As a result, the exploration and exploitation of these shales is capital intensive, requiring years of experience and millions of dollars in investment.  For this reason, bidders for these

Utica/Collingwood properties were limited; and Encana and Chesapeake were two of only a few industry players active in northern Michigan and with the capital and expertise necessary to exploit the Utica/Collingwood shales.

**B.      Price Terms Paid at the State of Michigan May 2010 Auction.**

27.      At the May 4, 2010, State of Michigan auction for some of its oil and gas leaseholds, the bidding for such leases was highly competitive, particularly between Encana and Chesapeake; and buyers at this auction paid record-setting price terms to acquire such leases.

28.      Leading up to and immediately after the May State of Michigan auction, NorthStar was contacted by several buyers interested in acquiring its Utica/Collingwood leaseholds in northern Michigan.  They included Encana and Chesapeake, with Michael Coy of OILN, on Chesapeake's behalf, contacting NorthStar by April 28, 2010, and Kit Akers of Encana USA contacting NorthStar by May 5, 2010.

29.      Because of this heightened demand for its deep rights acreage, NorthStar analyzed the value of its Utica/Collingwood leaseholds by comparing its leases to leases sold at the State of Michigan May auction; and NorthStar concluded that leases in the same township as NorthStar's typically sold for substantially more than $3,000 per acre at the May auction.

**C.      The Confidentiality Agreements and Bid Packages.**

30.      In early June 2010, after receiving several more inquiries from interested buyers about its northern Michigan leaseholds, NorthStar put out for bid an initial total of 9,830 net acres that could be used to explore and drill the Utica/Collingwood shale (**"net Utica/Collingwood acres"**), all of which were located in the following counties: Antrim, Charlevoix, Cheboygan, Montmorency, and Otsego counties.  On or around June 17, 2010,

NorthStar added 8 net Utica/Collingwood acres in Kalkaska County, bringing the total net Utica/Collingwood acreage out for bid to 9,838.

31.     The significant cost and expertise necessary to exploit the Utica/Collingwood shale limited the number of prospective bidders on Utica/Collingwood acreage.  Only three interested buyers, Encana, Chesapeake (through OILN), and Atlas Gas & Oil Company, LLC, now Chevron, signed the Confidentiality Agreement to see the specifics on NorthStar's leaseholds.

32.     Chesapeake, by and through Michael Coy of OILN, signed the Confidentiality Agreement with NorthStar on June 10, 2010, and Kit Acres of Encana USA signed its Confidentiality Agreement with NorthStar on June 10, 2010.  Copies of these Confidentiality Agreements are attached here as **Exhibit D** and **Exhibit E**.

33.     On June 14, 2010, NorthStar emailed identical packages of materials to all three prospective buyers, which specifically requested a proposal for "a cash purchase of a 75% interest in all of the leases" described within the provided materials, and stated, "NorthStar would like to be carried for the additional 25%."  NorthStar's proposal requested that all potential buyers submit their offers no later than 3:00 pm (CDT) on June 25, 2010.

**D.     Improper Sharing of Confidential Information and the Conspiracy to Depress Prices.**

34.     Even before receiving such bid materials from NorthStar, Encana and Chesapeake were sharing information and otherwise conspiring not to compete against each other for leaseholds in northern Michigan, including NorthStar's, with the primary purpose of depressing prices at which each could buy such leases.

35.     By at least June 6, 2010, Chesapeake and Encana officials had started discussions of a collusive, joint strategy to avoid direct competition between Chesapeake and Encana in

acquiring leases for Utica/Collingwood acreage, with the objective of depressing the prices both were paying for such leases.

36.     Throughout June of 2010, executives at Chesapeake and Encana exchanged emails formulating and discussing their agreement to avoid bidding against each other at future sales of Utica/Collingwood acreage.  They included, but are not limited to, the following:

On June 6, 2010, Chesapeake VP Doug Jacobson sent an e-mail to Encana VP John Schopp, with a copy to Chesapeake CEO Aubrey McClendon, outlining a proposal in which "**ECA would be responsible for new leasing in Charlevoix, Cheboygan, Missaukee and western Roscommon Counties while CHK would be responsible for leasing in Emmett [sic], Antrim, Kalkaska, western Otsego and western Crawford counties.**"   *See*, **Exhibit  F**, String of Email Correspondence sent between June 6 and June 16, 2010, p. 3 (emphasis added).

On June 7, 2010, Encana VP John Schopp sent an email to Chesapeake, with a copy to Encana CEO Randy Eresman, commenting, "**This looks like a great start.  A few suggestions that would maximize our effectiveness: * * * **"  *Id.,* p. 2  (emphasis added).  Among those recommendations was a proposal that the two companies split private landowners into two categories: one that Chesapeake would handle, and another that Encana would handle.  Mr. Schopp proposed that Encana, not Chesapeake, should be responsible for leasing in Kalkaska, Cheboygan, and Emmet.  "**EnCana is mainly engaged in three counties right now, so we'd like to be responsible for leasing in those counties to maintain our momentum: Kalkaska, Cheboygan, and Emmitt [sic].**"  *Id.,* p. 3 (emphasis added). Further, Mr. Schopp proposed dividing the deep rights holders between the two corporations: "**We suggest that EnCana lead negotiations with Breitburn, Blackstone, Simpson**, **and Anderson as these are adjacent to Kalkaska County, while CHK lead on Merit, Frontier, Zaremba, and SRW**."  *Id.* (emphasis added).

On June 14, 2010, Chesapeake VP Doug Jacobson stated in response to Encana VP John Schopp's proposal to divide private landowners between Chesapeake and Encana: "**On the various points below, here's our thoughts: A) CHK is agreeable to ECA taking Kalkaska, Cheboygan, and Emmitt [sic].  CHK will work Charlevoix, Missaukee, Antrium [sic], western Roscommon, western Otsego, and western Crawford[.]**"  *Id*., p. 2 (emphasis added).  Mr. Jacobson further noted, "**The split of responsibilities as to specific companies you've suggested below will work** with the exception of 'Anderson' [a deep rights leaseholder]."  *Id.* (emphasis added).

On June 15, 2010, Chesapeake VP Doug Jacobson stated to Encana VP John Schopp, "**[W]e are basically good with the county split you've proposed[.]**"

*Id.*, p. 1 (emphasis added).  Further, Mr. Jacobson suggested that he and Mr. Schopp discuss plans to split up where and from whom each company would lease, and went on to state, "**[W]hen you are back in the saddle, I'd like to visit with you about the implications of the impact of our competition on acreage prices and whether or not the sooner we do this the better shot we have of keeping acreage prices from continuing to push up."** *Id.* (emphasis added).

On June 15, 2010, the day after NorthStar emailed the lease packages to OILN/Chesapeake, Chesapeake CEO Aubrey McClendon emailed top Chesapeake and Encana executives, stating, "**[It] looks like NorthStar wants us to bid against each other next week, let's decide who should handle that one – thanks."** *See*, **Exhibit G**, String of Email Correspondence sent between June 6 and June 25, 2010, p. 2 (emphasis added).

37.     Furthermore, the emails exchanged between Chesapeake executives and Encana executives discussing their agreement to avoid bidding against each other clearly illustrates that the objective of the agreement was to lower prices.  These emails include, but are not limited to, the following:

On June 15, 2010, Chesapeake VP Doug Jacobson sent an email to Encana VP John Schopp that noted Chesapeake was agreeable to a **"county split"** and urged quick action to keep **"acreage prices from continuing to push up."** *See*, **Exhibit F**, String of Email Correspondence sent between June 6 and June 16, 2010, p. 1 (emphasis added).

Later that same day, on June 15, 2010, Chesapeake CEO Aubrey McClendon, forwarded the email correspondence between Chesapeake VP Doug Jacobson and Encana VP John Schopp quoted in the previous paragraph to Encana USA CEO Jeff Wojahn and Encana CEO Randy Eresman.  Mr. McClendon assured the Encana CEOs that Chesapeake was working toward their agreement:  "**Fyi, pushing from our end to save us both some money**, Aubrey." *Id.,* p. 1 (emphasis added).  Mr. Eresman responded: "**Agreed. The sooner the better. Thanks for continuing to move this forward.**" *Id.* (emphasis added).

On June 16, 2010, O.I.L Niagaran Land & Business Development Manager David McGuire emailed executives at Chesapeake, including Chesapeake CEO Aubrey McClendon and Chesapeake VP Doug Jacobson, to discuss pricing strategies involving Walter Zaremba, a deep rights owner in northern Michigan.  "**Just finished with Walter Zaremba, offered $2,500** (19,000 +- net acres) which is just short of $50MM.  **He said we're half way there to his wanting $5,000 per acre to sell.  Didn't feel the extra $250 per acre was going to help for now . . . Any advice**??" *See*, **Exhibit H**, String of Email Correspondence sent on June 16 and June 17, 2010, p. 1 (emphasis added).  On the same day, Mr. McClendon

responded: "**Hang tough, he won't get 5000**." *Id.* (emphasis added).  Further, Mr. McClendon advised Chesapeake VP Doug Jacobsen: "Doug: **time to smoke a peace pipe with eca on this one if we are bidding each other up.**" *Id* (emphasis added).  Mr. Jacobson responded that he had contacted Encana **"to discuss how they want to handle the entities we are both working with to avoid us bidding each other up in the interim."** *See*, **Exhibit I**, Reuters article dated June 25, 2012, 2012, p. 2 (emphasis added).  Mr. McClendon responded, "Thanks." *Id.*

On June 17, 2010, Encana VP John Schopp sent Chesapeake VP Doug Jacobson an email, with a copy to Encana USA President Jeff Wojahn, commenting, "**I certainly feel that combining forces will be helpful for preventing further inflation. After a time, we might benefit from some deflation as well.**  Your thoughts?" *See*, **Exhibit G**, String of Email Correspondence sent between June 6 and June 25, 2010, p. 1 (emphasis added).

On June 22, 2010, Encana VP John Schopp sent another email to Chesapeake VP Doug Jacobson, with a copy to Encana USA President Jeff Wojahn, stating "**As we continue with our leasing activities, it is becoming increasingly apparent that we need an AMI in place soon versus our alternative to escalate prices**." *Id.* (emphasis added).

38.     In addition to the above emails, internal log entries at Chesapeake reported that, on June 18, 2010, a Chesapeake vice president was "working with [Encana] to try and avoid bidding each other up"; and a subsequent entry, dated June 25, 2010, reported that a Chesapeake official continued to work with Encana "so we don't continue to push the price up" on northern Michigan leases.  *See*, **Exhibit I**, Reuters article dated June 25, 2012, p. 4.

39.     Proposed drafts of the so-called AMI ("Area of Mutual Interest") Agreement contemplated by the above-quoted emails and logs were subsequently circulated within Chesapeake.  Although Chesapeake and Encana never signed this proposed agreement, contents of a proposed draft of that agreement show its anti-competitive purpose:

A paragraph, addressing future state lease sales, states: "At any time during the bidding process a party may stop bidding on any designated tract, at which point the other party may commence bidding on such tract."  *See* **Exhibit J**, Reuters article dated December 27, 2012, p. 3.

A comment in the margin next to this paragraph from David Bolton, a senior landman at Chesapeake closely involved in Chesapeake's Michigan land leasing, notes: "This will be difficult to enforce – I would suggest we keep this simple and coordinate our bidding efforts within the AMI lands prior to the lease sale.  Then offer each the lease according to this agreement just as we would any other.  Your thoughts?"  *Id.*

Another paragraph of that draft AMI states: "With respect to the tracts that are designated for bidding by only one party, the other party will be free to bid independently bid [sic] on said tracts, including bidding against the designated party."  *Id.*

And a comment on this paragraph from Mr. Bolton, states: "**Why have this [paragraph] if the goal is to keep from running the prices up on each other?**"  *Id.* (emphasis added).

40.     The above emails and other documents evidence an agreement between Encana and Chesapeake to improperly share confidential information and otherwise collude for the purpose of depressing the price terms at which each company could acquire Utica/Collingwood acreage.  Moreover, the emails and documents demonstrate that, in addition to lower prices, Encana and Chesapeake contemplated that their agreement could provide each party with additional leverage with which to extract more favorable terms in those acquisitions.  Further, on or around June 23, 2010, only days after Chesapeake's email to Encana, inquiring as to which of the two companies was going to "handle" acquiring the NorthStar acreage, Encana conveyed to NorthStar that it was no longer interested in acquiring NorthStar's leases then out for bid.

41.     As a result, only Chesapeake/OILN made an offer to buy NorthStar's leases by the June 25th deadline; and, without knowledge of Encana/Chesapeake's collusion, NorthStar agreed to sell 7,220 of its 9,838 net mineral acres out for bid to Chesapeake at price terms significantly below what NorthStar had requested and the then true market value (see Paragraphs 42-43 below).  Pursuant to the general terms of that agreement, Chesapeake/OILN agreed to the following:

- To pay a bonus price of $2,250 per acre for 7,220 net mineral acres.
- To provide NorthStar with a 10% well participation right.
- To close no later than July 30, 2010.
- That the parties' agreement was subject to a mutually acceptable form of PSA

*See*, **Exhibit K**, Copies of Chesapeake's Offer, NorthStar's Counter-Offer, and Chesapeake's Acceptance of Counter-Offer.

42.     The information obtained by Chesapeake and its knowledge of Encana's absence from the bidding process resulted in Chesapeake/OILN having an extraordinarily strong (albeit illicit) bargaining position with and/or against NorthStar, and resulted in the above agreement for Chesapeake/OILN to buy some of NorthStar's leases out for bid (7,220 of its 9,838 net mineral acres) at terms significantly more favorable than Chesapeake/OILN would have received in a competitive market.  This included a bonus price of $2,250 per acre when similar leaseholds were selling for in excess of $3,000 per acre (see Paragraphs 42-43 below).

**E.     The Then True Market Value for NorthStar's Leases.**

43.     The acreage NorthStar put out for bid were leaseholds from the same townships and counties in northern Michigan where comparable leases had sold at the May 2010 State of Michigan auction for an average bonus price per acre in excess of $3,000, with the overwhelming majority of NorthStar's acreage from townships in Charlevoix and Cheboygan counties, where comparable leases had sold at the May auction for an average bonus price per acre of $3,043.58 and $3,727.71, respectively.  Such bonus prices had been paid for State of Michigan leases despite the fact that they were expiring leaseholds, and not held by production leases, like approximately two-thirds of NorthStar's leases.

44.     Absent collusion, NorthStar would have realized substantially higher price terms, more consistent with the market value and similar to or higher than the price terms at which

comparable acreage sold at the May 2010 State of Michigan auction.  Also, Encana and

Chesapeake's agreement provided Chesapeake with the ill-gotten bargaining power necessary for

Chesapeake/OILN to modify and thereby effectively renege on its agreement with NorthStar.

**F.    The Collusion Resulted in Chesapeake/OILN Reneging on Its Agreements with
       Northern Michigan Leaseholders.**

45.    On July 8, 2010, OILN's Michael Coy sent NorthStar a letter officially accepting

NorthStar's counter-offer.  The parties had reached agreement on these terms before July 8 and,

in fact, Chesapeake/OILN had already sent the proposed PSA to NorthStar as of July 1, 2010.

46.    After Chesapeake/OILN and NorthStar came to an agreement on the terms of

their deal, albeit on terms less favorable than NorthStar would have received in a competitive

market, Chesapeake and Encana continued to share information and otherwise collude to depress

prices each would have to pay to acquire acreage in the Utica/Collingwood play.  That is evident

in emails exchanged between Chesapeake and Encana, including, but not limited to, the

following:

> On July 16, 2010, David McGuire of OILN wrote Chesapeake executives
> reporting the fact that **both Encana and Chesapeake had cut their maximum
> amount per acre that they had been bidding by 50%.**  *See*, **Exhibit I**, Reuters
> article dated June 25, 2012, p. 5 (emphasis added).  In his email, Mr. McGuire
> asked Chesapeake executives if the sudden cut in lease bids was a **"coincidence."**
> *Id.*  In response, Mr. McGuire was told by Chesapeake VP Doug Jacobson to
> reduce further lease acquisitions. *Id.*
>
> On July 19, 2010, Encana USA President Jeff Wojahn wrote Chesapeake CEO
> Aubrey McClendon, stating, **"Aubrey, we have decided to discontinue further
> leasing at this time. . . . We will reassess our position after the summer."**  *See*,
> **Exhibit L**, Reuters article dated July 11, 2012, p. 2 (emphasis added).  Mr.
> McClendon responded five minutes later: **"Are you wanting to exit the play
> entirely? Have 5 minutes to discuss today?"** *Id.* (emphasis added).
>
> Later on July 19, Encana USA President Jeff Wojahn wrote to Chesapeake CEO
> Aubrey McClendon, stating **"We are not exiting the play but rather we are
> stopping further leasing.  At this time we are happy with our current**

**position.  We will reassess this fall as we evaluate the October state sale.”**  *Id.* (emphasis added).

47.     Armed with this information, Chesapeake executives, including CEO Aubrey McClendon, not only directed that its buying agents drop Chesapeake's maximum price for leases by 50% on July 16 (as stated above), but also directed that Chesapeake's agents, including OILN, suspend or otherwise find ways out of the deals Chesapeake's agents had entered into for oil and gas leases in northern Michigan.  Consistent with these directives, Chesapeake, by and through its agents, terminated its agreements to buy leases from private landowners in northern Michigan.

48.     Based on its collusive agreement with Encana, Chesapeake knew it could back out without risk of its principal competitor snapping up the land.  Moreover, Chesapeake was able to bring to fruition the primary goal of its collusive agreement with Encana by reneging on and/or modifying its deals with northern Michigan landowners – to ultimately pay less for chosen Utica/Collingwood acreage.

49.     On July 20, 2010, Chesapeake CEO Aubrey McClendon rationalized Chesapeake's directives in an email to its buying agents, stating: “Very sorry about this, I am sure some conversations will not be pleasant, but **with [Encana] gone, we have the ability to do this** and I can assure you we have the need to do it.” *See*, **Exhibit L**, Reuters article dated July 11, 2012, p. 2 (emphasis added).

**G.     Chesapeake/OILN Reneged on Its Agreement with NorthStar.**

50.     Chesapeake/OILN's actions in its dealings with NorthStar – along with its actions in dealing with other northern Michigan private landowners – in mid-July 2010 are consistent with those directives to delay or otherwise get out of agreements Chesapeake/OILN had already made to buy Utica/Collingwood acreage.

17

51.     Those actions included foisting on NorthStar several revisions to the closing date for the PSA by which Chesapeake/OILN extended the closing date for Chesapeake/OILN to buy the subject leases.  In its letter accepting NorthStar's counter-offer, Chesapeake/OILN stated, "Your interest in pursuing a quick closing is consistent with our intentions and as such we look forward to a [sic] working with NorthStar in an expeditious manner finalizing the PSA," and agreed to the inclusion of NorthStar's proposed closing on July 30, 2010 in the original proposed PSA.  However, Chesapeake/OILN subsequently, on July 28, 2010, extended the closing date in the PSA to October 29, 2010.

52.     In the same version of the PSA that included this closing date of October 29, 2010, Chesapeake/OILN also foisted onto NorthStar a new term in the PSA, which, as originally proposed, incorporated a never-before-discussed or agreed-to liquidated damages provision. That provision, as set forth in the emails below, was subsequently "tweaked" by Chesapeake/OILN to give itself a completely one-sided option to purchase in lieu of having to close on the PSA.

53.     The relevant sequence of events resulting in Chesapeake/OILN's inclusion of these terms are:

> On July 28, 2010, Dave McGuire of OILN emailed to NorthStar a proposed version of the PSA, which – for the first time – included a liquidated damages provision, stating: "If OILN fails to consummate Closing in all respects and if Seller [NorthStar] is not in breach of this Agreement, Seller shall be entitled to the [$750,000] Deposit as liquidated damages as its sole remedy."

> On August 2, 2010, McGuire emailed NorthStar stating: "[W]e have another 'tweak' to propose to you tomorrow."

> On August 3, 2010, McGuire emailed NorthStar with its final take-it-or-leave-it proposal, which included as its "tweak" the addition of the following bolded language to the liquidated damages provision (included in the PSA only days before): "If OILN fails to consummate Closing in all respects and if Seller [NorthStar] is not in breach of this Agreement, Seller shall be entitled to the [$750,000] Deposit as liquidated damages as its

sole remedy **and OILN shall have the option to receive an assignment from Seller as to its choice of seven hundred and fifty (750) net mineral acres . . . ."** *See*, **Exhibit M,** String of Email Correspondence sent between July 28 and August 3, 2010.

54.     Immediately after foisting these new terms onto NorthStar, Chesapeake/OILN informed NorthStar that its August 3, 2010, version of the PSA was a take-it-or-leave-it "proposal" to consummate a deal.

55.     Operating without knowledge of Encana's and Chesapeake's actions (in artificially depressing demand and price terms for NorthStar's and other landowners' leaseholds), on August 5, 2010, NorthStar agreed to Chesapeake/OILN's final deal and executed the PSA attached as **Exhibit N.**

56.     The terms of the executed PSA were even further removed from what NorthStar would have realized in a competitive market.  Originally, in June of 2010, Encana's and Chesapeake's collusive actions and information sharing enabled Chesapeake/OILN to buy at price terms significantly below the then market value for those leases (as described in Paragraphs 42-43 above).

57.     Subsequently, in the first week of August 2010, Encana and Chesapeake's collusive actions and information sharing enabled Chesapeake/OILN to foist the option to buy into the PSA (described above), obligating Chesapeake/OILN to buy even less acreage (only 750 of the 7,200 net acres originally agreed to) at a bonus price even further below the market value for that acreage, further depressing the bonus price per acre from $2,250 to $1,000 per acre (equal to a 56% drop in price). In addition, this option to purchase allowed Chesapeake/OILN to avoid providing NorthStar with its 10% participating interest in the acreage Chesapeake/OILN did acquire.

**H.     The Anticompetitive Collusion Caused Dramatically Lower Revenues at the State of Michigan October Auction**

58.     Emails between Chesapeake and Encana executives between October 14 and October 20, 2010, show that Encana and Chesapeake continued their collusive practices in anticipation of the second State of Michigan lease auction in 2010, scheduled to be held on October 26-27.  Those emails include, but may not be limited to:

> On October 14, 2010, an Encana U.S. official emailed Chesapeake stating that he **"wanted to identify Encana's suggested contract lands and bidding responsibilities so you can take a look"** before the upcoming October State of Michigan lease auction.
>
> On October 17, 2010, Chesapeake CEO Aubrey McClendon emailed Encana USA President Jeff Wojahn: **"Understand our teams are working on a cooperative approach to state leasing, that's good I think.  Anything else out there encouraging to talk about?"**
>
> On October 20, 2010, Encana USA President Jeff Wojahn sent Chesapeake CEO Aubrey McClendon an update: **"From what I understand John Schopp has been leading the charge on working with your team on arranging a bidding strategy.  I have a meeting planned on Friday and a review with Randy Monday."**  *See*, **Exhibit I**, Reuters article dated June 25, 2012, p. 4 (emphasis added).

59.     On October 26-27, 2010, the State of Michigan held its second lease auction of the year, which included a large amount of acreage that could be used to explore and drill the Utica/Collingwood shale.

60.     Comparing the results from the State of Michigan's May auction with the results of its October auction, there is a significant decrease from May to October in the prices paid by buyers for acreage located in the same township as NorthStar's acreage out for bid, including, for example, leases that sold for bonus prices of more than $3,000 per acre in May versus $13 per acre in October.

61.     Unlike at the May 2010 auction, where Chesapeake and Encana directly competed against each other to buy state leases, Chesapeake and Encana, by and through buying agents, only purchased 320 and 1,675 acres, respectively; and, significantly, they did not buy any acreage from the State of Michigan located in the same county.  *See*, **Exhibit I**, Reuters article dated June 25, 2012, p. 8.  This continued lack of competition between Chesapeake and Encana was (again) a substantial cause of the significant drop in prices for such leases from the May to the October auction.

**I.      Chesapeake/OILN Fails to Close on Its PSA with NorthStar**

62.     The extended closing date that Chesapeake/OILN foisted into the executed PSA was October 29, 2010, two days after the date of the State of Michigan October auction. Immediately after the close of the State of Michigan October auction, at 6:08 p.m. on October 27, Chesapeake/OILN exercised its ill-gotten option to purchase in lieu of closing on its PSA with NorthStar, resulting in Chesapeake/OILN buying only 750 net acres at a price of $1,000 per acre.  A copy of Chesapeake/OILN's notice to NorthStar exercising this option to purchase is attached as **Exhibit O**.

<u>**COUNT I**</u>
**VIOLATION OF THE SHERMAN ACT**
**AGREEMENT AND CONSPIRACY TO RESTRAIN TRADE**
**AS TO ALL DEFENDANTS**

63.     NorthStar incorporates the preceding paragraphs of the Complaint as though fully restated here.

64.     Defendants are "persons" as defined under the Sherman Act, 15 U.S.C. § 7.

65.     Beginning in May 2010, Defendants, as co-conspirators, engaged in an unlawful contract, combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

66.     Specifically, Defendants conspired and colluded to avoid bidding against one another on NorthStar's oil and gas deep rights leaseholds.

67.     Each of the Defendants has engaged in one or more overt acts in furtherance of the contract, combination, and conspiracy described herein.  The means and methods used by Defendants to implement the aforesaid agreement and conspiracy included, *inter alia*, the following:

    a.  agreed, during e-mail conversations, to allocate territory between themselves;

    b.  allocated territory between themselves, pursuant to such conversations;

    c.  participated in conversations discussing which designated co-conspirator would purchase deep rights from particular leaseholders, including NorthStar;

    d.  agreed, during such conversations, which designated co-conspirator would purchase deep rights from particular leaseholders, including NorthStar;

    e.  agreed, during such meetings and conversations, not to bid against each other.

68.     As a direct and proximate result of the violations of law alleged herein, NorthStar has suffered antitrust injury to its business and property.  NorthStar has been injured by the Defendants' unlawful conspiracy in that NorthStar sold acreage during the Defendants' conspiracy at a lower price than it would have absent the Defendants' conspiracy.  Chesapeake also chose not to finalize its contract with NorthStar for the full value of NorthStar's Utica/Collingwood rights, because the anticompetitive conspiracy between Defendants enabled Chesapeake to foist terms upon NorthStar and obtain Utica/Collingwood rights in northern Michigan at substantially reduced prices.  But for Encana and Chesapeake's collusion, the transaction between NorthStar and Chesapeake would have closed much earlier, and NorthStar would have received the benefit from the consummation of the entire transaction.

69. The Defendants' unlawful conduct has therefore unreasonably restrained trade in the relevant market, which is the market for oil and gas leaseholds.

70. Moreover, Defendants are liable for treble damages, plus NorthStar's reasonable attorney fees, costs, and interest pursuant to 15 U.S.C. § 15.

WHEREFORE, NorthStar respectfully requests that this Court adjudge and decree that the conspiracy and collusion between Encana, Chesapeake, and their related entities violates Section 1 of the Sherman Act, 15 U.S.C. § 1; award NorthStar treble its damages sustained, to be proven at trial, plus interest, costs, and attorney's fees; and award such other relief as this Court deems appropriate.

## COUNT II
## VIOLATION OF THE SHERMAN ACT
## CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION AND RESTRAIN TRADE
## AS TO ALL DEFENDANTS

71. NorthStar incorporates the preceding paragraphs of the Complaint as though fully restated here.

72. Defendants are "persons" as defined under the Sherman Act, 15 U.S.C. § 7.

73. Beginning in May 2010, Defendants as co-conspirators engaged in an unlawful contract, combination, or conspiracy through a continuing agreement to exchange competitive information regarding the Defendants' Utica/Collingwood leasing activity in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

74. Defendants shared information regarding their bidding activities in Michigan and in doing so reduced competition for Utica/Collingwood acreage.

75. The relevant geographic market for the claim alleged in this Count is the portion of northern Michigan, including Kalkaska, Emmet, Cheboygan, Charlevoix, Crawford, Roscommon, and Missaukee counties, that includes the Utica and Collingwood shale formations, and the relevant market consists of acreage from which the Utica/Collingwood shales may be explored and developed.

76. Each of the Defendants has engaged in one or more overt acts in furtherance of the Defendants' continuing agreement to exchange competitive information described herein. The means and methods used by Defendants to implement the aforesaid agreement and conspiracy included, *inter alia*, the following:

      a. conducted e-mail conversations exchanging competitive information regarding the allocation of territory between themselves;

      b. participated in conversations discussing which designated co-conspirator would purchase deep rights from particular leaseholders, including NorthStar;

      c. exchanged competitive information regarding each Defendant's Utica/Collingwood leasing plans and activities.

77. As a direct and proximate result of the violations of law alleged herein, NorthStar has suffered antitrust injury to its business and property. NorthStar has been injured by the Defendants' unlawful conspiracy and exchange of information in that the Defendants were armed with increased bargaining power as a result of the absence of competition created by the Defendants' illegal information exchanges. As a direct result of this conspiracy and information exchange, NorthStar agreed to sell its Utica/Collingwood acreage at a lower price than it would have absent the Defendants' conspiracy and information exchanges. In addition, as a result of these improper information exchanges, Chesapeake was able to foist upon NorthStar a bad faith

"liquidated damages" clause and ultimately avoid performing its obligations to NorthStar for the full value of NorthStar's Utica/Collingwood rights.

78.     The Defendants' unlawful conduct has therefore unreasonably restrained trade in the relevant market, which is the market for oil and gas leaseholds.

79.     Moreover, Defendants are liable for treble damages, plus NorthStar's reasonable attorney fees, costs, and interest, pursuant to 15 U.S.C. § 15.

WHEREFORE, NorthStar respectfully requests that this Court adjudge and decree that the conspiracy, collusion, and information exchanges between Encana, Chesapeake, and their related entities violate Section 1 of the Sherman Act, 15 U.S.C. § 1; award NorthStar treble its damages sustained, to be proven at trial, plus interest, costs, and attorney's fees; and award such other relief as this Court deems appropriate.

**COUNT III**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT**
**AGREEMENT AND CONSPIRACY TO RESTRAIN TRADE**
**AS TO ALL DEFENDANTS**

80.     NorthStar incorporates the preceding paragraphs of the Complaint as though fully restated here.

81.     The anticompetitive agreement described in Count I unreasonably restrains trade in violation of Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

WHEREFORE, NorthStar respectfully requests that this Court adjudge and decree that the conspiracy and collusion between Encana, Chesapeake, and their related entities violated Section 2 of the Michigan Antitrust Reform Act, MCL 445.772; award NorthStar treble its damages sustained, to be proven at trial, plus interest, costs, and attorney's fees; and award such other relief as this Court deems appropriate.

## COUNT IV
### VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT
### CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION AND RESTRAIN TRADE
### AS TO ALL DEFENDANTS

82.     NorthStar incorporates the preceding paragraphs of the Complaint as though fully restated here.

83.     The anticompetitive information exchanges described in Count II unreasonably restrains trade in violation of Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

WHEREFORE, NorthStar respectfully requests that this Court adjudge and decree that the conspiracy and collusion between Encana, Chesapeake, and their related entities violated Section 2 of the Michigan Antitrust Reform Act, MCL 445.772; award NorthStar treble its damages sustained, to be proven at trial, plus interest, costs, and attorney's fees; and award such other relief as this Court deems appropriate.

## COUNT V
### TORTIOUS INTERFERENCE
### WITH BUSINESS CONTRACT OR EXPECTANCIES
### AS TO ENCANA, ENCANA USA, AND CHESAPEAKE ONLY

84.     NorthStar incorporates the preceding paragraphs of the Complaint as though fully restated here.

85.     By the June/July 2010 timeframe, NorthStar had invested a significant amount to acquire, extend, and maintain a large inventory of oil and gas leases in northern Michigan (including the 9,838 net Utica/Collingwood acreage), putting NorthStar in an economically advantageous position – as one of the largest private leaseholders in the market – when the profitability peaked for such Utica/Collingwood acreage.

86.     Chesapeake and Encana had knowledge of NorthStar's advantageous leasehold position.  In fact, prior to the initiation of the bid process in the beginning of June 2010,

representatives for Encana USA and OILN contacted NorthStar in an effort to acquire its Utica/Collingwood acreage.

87.     As set forth in more detail above, the anticompetitive conspiracy between Chesapeake and Encana was intentionally and improperly designed to subvert NorthStar's advantageous leasehold position by exchanging proprietary and strategic information, refusing to compete, and/or otherwise jointly conspiring for the sole purpose of depressing the price that would have to be paid to acquire NorthStar's Utica/Collingwood acreage.

88.     Chesapeake and Encana's conspiracy induced the desired result, as OILN reached an agreement with NorthStar by July 8, 2010 to acquire substantial acreage at a price significantly below market value and without any significant competition from any other buyers, including Encana.

89.     With knowledge of OILN's agreement with NorthStar, Chesapeake and Encana's subsequent, continued conspiracy further intentionally and improperly interfered with NorthStar's advantageous position and its agreement with OILN via an exchange of proprietary and strategic information that enabled OILN to improperly modify its contract or undo the terms of Chesapeake/OILN's promise to buy, established by July 8.

90.     Due to this interference, NorthStar has suffered (and will suffer) damages in the millions of dollars lost because Defendants' conspiracy interfered with and prevented the sale of its Utica/Collingwood leaseholds at their peak market value and, in addition or in the alternative, for the loss of the benefits under its contract or Chesapeake/OILN's promise to buy established by July 8.

WHEREFORE, NorthStar respectfully requests that this Court award NorthStar its damages available under the law, in an amount to be proven at trial, plus interest, costs, and attorney's fees, and award such other relief as this Court deems appropriate.

### COUNT VI
### CIVIL CONSPIRACY AND CONCERT OF ACTION
### AS TO ALL DEFENDANTS

91.     NorthStar incorporates the preceding paragraphs of the Complaint as though fully restated here.

92.     Defendants had a preconceived plan to illegally suppress competition, defraud, and/or tortiously interfere with the sale of leaseholds by NorthStar (and other northern Michigan leaseholders) with the sole purpose of depressing the then true market price for those leases.

93.     All Defendants performed acts in pursuit of their preconceived plan and they, each and collectively, contributed to the restraint of trade and tortious interference with NorthStar's business expectancies and contract with OILN (as set forth in more detail above).

94.     Because Defendants not only had a preconceived plan but also committed acts in furtherance of the restraint of trade and other tortious acts alleged above, all of the Defendants are liable for acts of the others involved in the plan under a claim for both civil conspiracy and concert of action

95.     Pursuant to Michigan common law, *Baldwin v. Escanaba Liquor Dealers Ass'n*, 165 Mich. 98 (1911), all Defendants here are liable not only for their own acts of restraint of trade and tortious acts committed in furtherance of the conspiracy, but also for the acts of all other co-conspirators in furtherance of the conspiracy's objective.

96.    Also and in the alternative, pursuant to *Cousineau v. Ford Motor Co.*, 140 Mich. App. 19, 31-33 (1985), Defendants Encana and Chesapeake are liable for the tortious acts of each other, because they both acted tortiously and in concert, or jointly.

WHEREFORE, NorthStar respectfully requests that this Court award NorthStar its damages available under the law, in an amount to be proven at trial, plus interest, costs, and attorney's fees, and award such other relief as this Court deems appropriate.

**JURY DEMAND**

NorthStar hereby demands a jury for all issues so triable.

WARNER NORCROSS & JUDD LLP

Dated:  February 22, 2013                    By:  /s/ David R. Whitfield

                                             Brian J. Masternak (P57372)
                                             Charles N. Ash, Jr. (P55941)
                                             Lance R. Zoerhof (P63980)
                                             David R. Whitfield (P73352)
                                             900 Fifth Third Center
                                             111 Lyon Street NW
                                             Grand Rapids, MI 49503-2487
                                             bmasternak@wnj.com
                                             cash@wnj.com
                                             lzoerhof@wnj.com
                                             dwhitfield@wnj.com
                                             616.752.2000
                                             Attorneys for Plaintiff

8916349-2