IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORTHSTAR ENERGY LLC,
a Delaware limited liability company,

    Plaintiff,

v.

ENCANA CORPORATION,
a Canadian corporation, and

ENCANA OIL & GAS USA INC.,
a Delaware corporation, and

CHESAPEAKE ENERGY
CORPORATION,
an Oklahoma corporation, and

O.I.L. NIAGARAN, LLC,
a Michigan limited liability company,

    Defendants.

Case No. 13-cv-00200-PLM

Chief Judge Paul L. Maloney

NORTHSTAR ENERGY LLC'S
RESPONSE TO OILN'S
MOTION TO DISMISS

---

| | |
|---|---|
| Brian J. Masternak (P57372)<br>Charles N. Ash, Jr. (P55941)<br>Lance R. Zoerhof (P63980)<br>David R. Whitfield (P73352)<br>WARNER NORCROSS & JUDD LLP<br>900 Fifth Third Center<br>111 Lyon Street NW<br>Grand Rapids, MI 49503-2487<br>bmasternak@wnj.com<br>cash@wnj.com<br>lzoerhof@wnj.com<br>dwhitfield@wnj.com<br>616.752.2000<br>Attorneys for Plaintiffs | Molly S. Boast<br>Sanket J. Bulsara<br>WILMER CUTLER PICKERING HALE AND DORR, LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>molly.boast@wilmerhale.com<br>sanket.bulsara@wilmerhale.com<br>212.230.8800<br><br>Dennis G. Cowan (P36184)<br>Anthony J. Rusciano (P29834)<br>Michael J. Barton (P34509)<br>PLUNKETT COONEY, P.C.<br>38505 Woodward Avenue, Ste. 2000<br>Bloomfield Hills, MI 48304<br>arusciano@plunkettcooney.com<br>mbarton@plunkettcooney.com<br>248.901.4000<br>Attorneys for Defendants<br>Chesapeake Energy Corporation and<br>O.I.L. Niagaran, LLC |

TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1
II. COUNTER-STATEMENT OF FACTS ................................................................................2
   A. OILN Acquires Leases for Chesapeake at the May State Auction – Bidding Directly Against Encana. ...........2
   B. Senior Executives at Encana and Chesapeake Collude to Depress Market Prices. ....................2
   C. The Illegal Agreement Directly Targets NorthStar ....................................................................3
   D. OILN Participates in the Collusive Scheme with Chesapeake and Encana. ..............................4
   E. OILN Does Not Withdraw from the Conspiracy; But Rather Continues to Act In Furtherance of It. ...........5
   F. After Buying State Leases on the Cheap, Chesapeake Fails to Close with NorthStar ................6
III. LAW AND ARGUMENT .....................................................................................................6
   A. Legal Standards .........................................................................................................................6
      1. Scope of Review ..................................................................................................................6
      2. Standard of Review .............................................................................................................7
   B. Chesapeake's Motion to Dismiss Does Not Assist OILN. ........................................................7
   C. NorthStar Sufficiently Alleged the Requisite Conscious Commitment to State a Claim Against OILN ..........8
      1. Post-*Twombly* Pleading Standard .......................................................................................8
      2. NorthStar Sufficiently Alleged OILN's Acquiescence in the Illicit Scheme ....................11
IV. CONCLUSION ....................................................................................................................12

TABLE OF AUTHORITIES

**Federal Cases**

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) ........ 7, 10, 11

*Brown v. Donco Enters. Inc.*
783 F.2d 644 (6th Cir. 1986) ........ 9

*Chiropractic Co-op Ass'n of Michigan v. American Medical Ass'n*
867 F.2d 270 (6th Cir. 1989) ........ 12

*Clark v. Hamilton Mortgage Co.*
2008 WL 919612 (W.D. Mich. Apr. 2, 2008) ........ 7

*Cloverleaf Enterprises, Inc. v. Maryland Thoroughbred, Horsemen's Ass'n, Inc.*
730 F. Supp. 2d 451 (D. Md. 2010) ........ 9

*Copperweld Corp. v. Indep. Tube Corp.*
467 U.S. 752 (1984) ........ 9

*Erie Cnty. v. Morton Salt, Inc.*
702 F.3d 860 (6th Cir. 2012) ........ 8, 11

*Flinkote Co. v. Lysford*
246 F.2d 368 (1968) ........ 13

*Hensley Mfg. v. ProPride, Inc.*
579 F.3d 603 (6th Cir. 2009) ........ 7

*In re Dairy Farmers of America, Inc.*
2013 WL 212908 (N.D.Ill. Jan. 18, 2013) ........ 12

*In re Elec. Books Antitrust Litig.*
859 F. Supp. 2d 671 (S.D.N.Y. 2012) ........ 11

*In re Packaged Ice Antitrust Litig.*
723 F. Supp. 2d 987 (E.D. Mich. 2010) ........ 10

*In re Polyurethane Foam Antitrust Litig.*
799 F. Supp. 2d 777 (N.D. Ohio 2011) ........ 10

*In re Se Milk Antitrust Litig.*
555 F. Supp. 2d 934 (E.D.Tenn. 2008) ........ 9

*JDC Management, LLC, v. Reich*
  644 F. Supp. 2d 905 (W.D. Mich. 2009) ................................................................................. 7, 8

*MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*
  62 F.3d 967 (7th Cir. 1995) ........................................................................................................ 13

*Monsanto v. Spray-Rite Serv. Corp.*
  465 U.S. 752 (1984), ................................................................................................................. 12

*Ohio Willow Wood Co. v. Alps S. LLC*
  2011 WL 1237582 (S.D. Ohio Mar. 29, 2011) ........................................................................ 10

*Tucker v. Middleburg-Legacy Place*
  539 F.3d 545 (6th Cir. 2008) ....................................................................................................... 8

*United States v. Paramount Pictures, Inc.*
  334 U.S. 131 (1948) .................................................................................................................. 11

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*
  156 F.3d 535 (4th Cir. 1998) ..................................................................................................... 13

*Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*
  648 F.3d 452 (6th Cir. 2011) ..................................................................................................... 12

*Weiner v. Klais & Co., Inc.*
  108 F.3d 86 (6th Cir. 1997). ........................................................................................................ 7

*Winget v. JP Morgan Chase Bank, N.A.*
  537 F.3d 565 (6th Cir.2008) ........................................................................................................ 7

**Federal Statutes**

Fed. R. Civ. P. 12(b) ....................................................................................................................... 7

Fed. R. Civ. P. 12(c) ....................................................................................................................... 7

I.  INTRODUCTION

In its Motion to Dismiss, Defendant O.I.L. Niagaran, LLC ("OILN") raises only one argument of its own, separate from Chesapeake.  OILN claims NorthStar failed to sufficiently allege facts tending to show OILN "consciously committed" to the anticompetitive scheme to depress prices.  Specifically, OILN argues:

- NorthStar "does not allege that OILN had any knowledge of Encana and Chesapeake's antitrust agreement" (Dkt. 23, p. 1.)

- OILN "neither participated in nor was aware of the communications between Encana and Chesapeake upon which NorthStar bases its claims" (Dkt. 23, p. 1.)

However, even the small handful of documents in NorthStar's possession reveals that OILN did, in fact, have direct knowledge of the conspiracy and actively participated in it.  The best example is the June 16, 2010 email exchange between Chesapeake and OILN.  In that exchange, David McGuire, a landman at OILN, seeks the advice of several of Chesapeake's top executives, including its CEO Aubrey McClendon, its Execute Vice President of Acquisitions and Divestitures Doug Jacobson, and its Vice President of Land Gary Dunlap.  McGuire had just finished meeting with Walter Zaremba to acquire his Utica/Collingwood mineral rights.  That email exchange contains the following individual emails:

- McGuire gives his thoughts on the negotiations with two mineral rights owners (Zaremba and Kitchen), stating: "offered $2,500 (19,000 +/- net acres)" or "$50MM" to buy Zaremba's mineral rights . . . ; [but he wants] 5,000 per acre to sell;" and "didn't feel that the extra $250 per acre was going to help for now [because] we need to pick up Kitchen for $2,500."  McGuire then asked, "Any advice??"

- In response, McClendon advises McGuire: "Hang tough, he won't get 5000; what about his non ops, doesn't he operate and only own about 50 pc?"  In the same very email, McClendon directs Jacobson: "Doug: tine [sic] to smoke the peace pipe with eca on this one if we are bidding each other up."

- McGuire then replies to McClendon to correct him, saying "Zaremba is not an operator, deep rights owner only."

- This prompts McClendon to ask McGuire and other Chesapeake executives: [w]ho is the company I saw on the map with a big spread but only about 50% net ownership?" Dkt. 1, ¶ 37; Dkt. 1-2, p. 31.

1

Far from being an innocent bystander, McGuire was brought in to McClendon's "inner circle" of conspirators (or, at the very least, stood at the outer edge of the inner circle).  What else could explain why a landman would be directly communicating with Chesapeake's CEO and VP?  Moreover, it appears as though McGuire was the one on the ground who negotiated with landowners and carried out the illegal scheme.  At this stage, the law merely requires NorthStar to plead allegations (when accepted as true and read in the light most favorable to NorthStar) plausibly suggesting OILN's "conscious commitment" to the anticompetitive scheme.  NorthStar's Complaint undoubtedly satisfies this burden.

II.     COUNTER-STATEMENT OF FACTS

  A. OILN Acquires Leases for Chesapeake at the May State Auction and Bids Directly Against Encana.

OILN's relationship with Chesapeake and its involvement in the Utica/Collingwood market pre-dates the bidding process on NorthStar's leases.  Dkt., 1, ¶¶ 28-29.  Chesapeake engaged OILN to assist it with the acquisition of leaseholds at the May 4, 2010, State of Michigan auction.  *Id.*  Bidding at the auction was very competitive – particularly between Encana and OILN (bidding on Chesapeake's behalf); and the head-to-head bidding between OILN and Encana caused the prices to skyrocket.  *Id.*  The auction yielded a record-setting $178 million for the State of Michigan, an amount greater than all previous state auctions combined.  Dkt., 1, ¶¶ 27-29; Dkt. 1-2, p. 33.  State acreage in the same county as NorthStar's Utica/Collingwood acreage brought lease bonuses in excess of $3,000 per acre.  Dkt. 1, ¶ 29.

  B. Senior Executives at Encana and Chesapeake Collude to Depress Market Prices.

Sometime after the May auction, Chesapeake and Encana began discussing a joint strategy to avoid bidding against one another for Utica/Collingwood acreage.  Dkt. 1, ¶ 34.  On June 6, 2010, after having had initial discussions (the content of which are unknown to NorthStar at this time), Chesapeake's Jacobson emailed Schopp (copying McClendon, Dunlap and Encana USA President Jeff Wojhan) proposing the companies agree not to bid competitively: "Sorry for the delay in getting back to you here. . .

2

Our proposal is pretty simple, but hopefully should be effective for us both. . . ." Dkt. 1, ¶ 36; Dkt. 1-1, p. 34. Jacobson proposed, among other things, that Encana and Chesapeake allocate responsibility for bidding by dividing up counties in order to avoid competing with one another, as well as dividing up the individuals/entities with large lease positions (who are referred to later in the email thread as the "deep rights holders").[1] *Id.* The next day, Schopp replied (adding Encana CEO Randy Eresman to the thread) "[t]his looks like a great start," and from there Defendants began, both verbally and in writing, to flesh out the details of their anticompetitive scheme. Dkt. 1, ¶ 36; Dkt. 1-1, p. 33.

    C. The Illegal Agreement Directly Targets NorthStar.

On June 14, 2010, NorthStar conveyed to Encana and OILN the bidding packages for its 9,830 net acres in the heart of the emerging oil and gas play for the Utica/Collingwood shale and requested that interested parties submit offers by 3:00 CDT on Friday, June 25, 2010 (Friday of the following week). Dkt. 1, ¶ 30-33. The next morning, at 6:51 A.M. on June 15, 2010, McClendon sent a message to the group (Jacobson, Schopp, Dunlap, Wojhan and Eresman): "Also with regard to B) below, looks like NorthStar wants us to bid against each other next week, let's decide who should handle that one – thanks." Dkt. 1, ¶ 36; Dkt. 1-1, p. 33. Approximately five hours later, Jacobson emailed Schopp to set up a discussion to further their scheme, and also to inquire about preparing a Letter of Intent ("LOI") to memorialize it: "when you are back in the saddle, I'd like to visit with you about the implications of the impact of our competition on acreage prices and whether or not the sooner we do this the better shot we have of keeping acreage prices from continuing to push up." Dkt. 1, ¶ 37; Dkt. 1-2, p. 32. Two minutes after sending the email to Schopp, Jacobson forwarded his email to McClendon and three other Chesapeake executives. Dkt 1-2, p. 34.

---

[1] For example, one reference to the "deep rights holders" is found in Schopp's June 7 email to Jacobson: "[r]egarding the deep rights holders, we agree that working together as you describe in item 4 below makes sense. We suggest that EnCana lead negotiations with Breitburn, Blackstone, Simpson and Anderson as these are adjacent to Kalkaska County, while CHK lead on Merit, Frontier, Zaremba, and SRW." Dkt. 1-2, p. 34.

3

Twenty five minutes later, at 12:06 P.M., McClendon forwarded Jacobson's message to Eresman and Wojahn, stating "[f]yi, pushing from our end to save us both some money, Aubrey." Dkt. 1, ¶ 37; Dkt 1-2, p. 34. A few hours later on the 15th, Eresman responded to McClendon: "Agreed. The sooner the better. Thanks for continuing to move this forward. Randy." *Id.* At 2:30 AM on June 16th, McClendon responded to Eresman regarding their agreement to prevent prices from rising (copying Wojahn): "We were a bit slow out of the box, but faster now!" *Id.*

### D. OILN Participates in the Collusive Scheme with Chesapeake and Encana.

That same day, June 16th, OILN's McGuire emailed Chesapeake's Dunlap and Dave Bolton (a senior Chesapeake landman), copying McClendon and Jacobson, asking for advice on OILN's negotiations over prices being demanded by certain landowners for Utica/Collingwood acreage, including Walter Zaremba and a "Kitchen" landowner. *Id.* McClendon took it upon himself to respond to McGuire's email, advising: "[h]ang tough, he won't get $5,000 . . . ." Dkt. 1, ¶ 37; Dkt. 1-2, p. 31. In that same email to McGuire, McClendon gave Jacobson the directive to reach an agreement with Encana: "[D]oug: tine [sic] to smoke a peace pipe with eca on this one if we are bidding each other up." *Id.* In a follow up email, McClendon confused the leases that OILN was trying to acquire from the Zarembas with those Chesapeake and OILN sought to acquire from NorthStar, asking McGuire, "[if not Zaremba, then] who is the company on the map with the big spread but only about 50% net ownership?" *Id.* This "company with the bid spread" of property was NorthStar.[2] Dkt. 1-5, pp. 12-15.

Jacobson then replied to McClendon that he had contacted Encana "to discuss how they wanted to handle the entities we are both working on to avoid us bidding each other up in the interim." Dkt. 1, ¶ 37; Dkt 1-2, p. 37; Dkt. 1-2, p. 31. McClendon responded, "Thanks." *Id.* NorthStar was one of the landowners that Encana and Chesapeake executes were trying to determine how to "handle" "in the interim."

---

[2] As shown on the schedule of NorthStar's leases, NorthStar's "net acres" for many of the leases listed is 50%. *See for e.g.,* Dkt. 1-5, pp. 12-15.

4

### E. OILN Does Not Withdraw from the Conspiracy, but rather Continues to Act in Furtherance of It.

McClendon made clear that he "[did] not want to complete [sic] with Encana on this [NorthStar] deal if CHK is interested." Dkt. 1-2, p. 36. As a result, Chesapeake and Encana did not compete for NorthStar's acreage; and, as of July 8, 2010, OILN put in writing the deal it had reached to acquire NorthStar's acreage for terms far less than Chesapeake/OILN and other buyers had paid for similar Utica/Collingwood acreage at the May 2010 State of Michigan auction. On July 16, 2010, McGuire noticed Chesapeake and Encana had cut the maximum price per acre in lease bids by 50%. Dkt. 1, ¶ 46. In his email, McGuire asked Chesapeake executives if the sudden cut in lease bonuses was a "coincidence?" *Id.*

Then, in the three months that followed, Chesapeake and OILN continued to ratchet down the price and other terms on its pending deals with NorthStar and other northern Michigan mineral rights owners. Dkt. 1, ¶ 50-57. As to the Purchase and Sale Agreement being negotiated with NorthStar, that included the following:

- Despite originally agreeing to a July 30, 2010 closing date, Chesapeake/OILN foisted several extensions to the closing date for the PSA and ultimately extended the closing to October 29, 2010 – after the fall State auction, when they knew prices would be dramatically lower than at the May auction earlier that year. *Id.*, ¶ 51.

- In the same version of the PSA that included this closing date of October 29, 2010, Chesapeake/OILN also foisted onto NorthStar a "liquidated damages" provision, which in reality operated to give Chesapeake a completely one-sided option to purchase in lieu of having to close on the PSA: "If OILN fails to consummate Closing in all respects and if Seller [NorthStar] is not in breach of this Agreement, Seller shall be entitled to the [$750,000] Deposit as liquidated damages as its sole remedy and OILN shall have the option to receive an assignment from Seller as to its choice of seven hundred and fifty (750) net mineral acres . . . ." *Id.*, ¶ 53.

- Chesapeake/OILN presented this new, unfavorable version of the PSA to NorthStar as a "take-it-or-leave-it" deal, which NorthStar had no choice but to accept. *Id.*, ¶ 54-55.

And, OILN continued to participate and further the illicit scheme by suspending or otherwise finding ways out of the deals OILN had entered into for oil and gas leases in northern Michigan. *Id.*, ¶ 47.

F.   After Buying State Leases on the Cheap, Chesapeake Fails to Close with NorthStar.

On October 26-27, 2010, the State of Michigan held its second lease auction of the year, which included a large amount of acreage that could be used to explore and drill the Utica/Collingwood shale. *Id.*, ¶ 59. In contrast to the May auction, prices plummeted. *Id.*, ¶ 60. For example, acreage located in the same township as NorthStar's acreage was fetching lease bonuses of more than $3,000 per acre in May. *Id.* By October, prices for comparable acreage in that same township fell to $13 per acre. *Id.* Through their "cooperative approach to state leasing," Defendants successfully reset the market for mineral rights in the Utica/Collingwood shale. *Id.,* ¶ 61.

In addition, unlike at the May 2010 auction, where Chesapeake directly competed with Encana for leases, at this October auction, Chesapeake bought no acreage located in the same county as Encana. Dkt. 1-2, p. 37. And, only hours after the auction, OILN (on behalf of Chesapeake) exercised the ill-gotten option to purchase in lieu of closing on its PSA with NorthStar, resulting in Chesapeake/OILN buying only 750 net acres at the bottom basement price of $1,000 per acre. Dkt. 1, ¶ 62.

III.   LAW AND ARGUMENT

A.   Legal Standards

1.   Scope of Review

On a motion to dismiss under Fed R. Civ. P. 12(b) or (c), courts primarily consider the allegations in the complaint, but may also consider the exhibits to the complaint, as this Court found in *JDC Management, LLC, v. Reich,* 644 F. Supp. 2d 905, 944 (W.D. Mich. 2009) (Maloney, C.J.) (internal citations omitted). However, matters outside of the complaint and its exhibits cannot be considered by a court in deciding such a motion to dismiss. *See Hensley Mfg. v. ProPride, Inc.,* 579 F.3d 603, 613 (6th Cir. 2009)

("When reviewing a motion to dismiss, the district court may not consider matters beyond the complaint.") (citing *Winget v. JP Morgan Chase Bank, N.A.,* 537 F.3d 565, 576 (6th Cir.2008)); *Clark v. Hamilton Mortgage Co.*, 2008 WL 919612, *1-2 (W.D. Mich. Apr. 2, 2008); *see also Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

### 2. Standard of Review

This Court has recognized that, even after *Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)*, a defendant seeking to dismiss a complaint under Fed. R. Civ. P. 12(b)(6) faces a heavy burden:

> Our Circuit cautions that district courts should not overstate the hurdle that *Twombly* establishes for plaintiffs to survive a Rule 12(b)(6) or Rule 12(c) motion:
>
> In *Erickson v. Pardus*, 551 U.S. [89], 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), decided two weeks after *Twombly*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.* at 2200 ( quoting *Twombly*, 127 S.Ct. at 1964). The opinion in Erickson reiterated that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Id. (citing *Twombly*, 127 S.Ct. at 1965). We read the *Twombly* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12.

*JDC Management*, 644 F. Supp. 2d at 943-44 (citing *Tucker v. Middleburg-Legacy Place,* 539 F.3d 545, 550 (6th Cir. 2008).

### B. Chesapeake′s Motion to Dismiss Does Not Assist OILN.

Since OILN's instant motion incorporates by reference Chesapeake's legal briefing in support of its motion to dismiss, NorthStar – in turn and for the sake of efficiency – incorporates by reference the arguments made in its response to Chesapeake's motion.  For the same reasons set forth in that response, NorthStar has stated actionable antitrust and secondary liability claims against OILN and dismissal of those claims is clearly not appropriate (for the same reasons it is inappropriate to dismiss NorthStar's claims

against Chesapeake). NorthStar, therefore, limits this response to the "conscious commitment" argument unique to OILN's instant motion.

  C.  NorthStar Sufficiently Alleged the Requisite Conscious Commitment to State a Claim Against OILN.

    1. Post-*Twombly* Pleading Standard.

An illegal agreement under 15 U.S.C. § 1 may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (internal quotations omitted). An agent to a member of such an illicit scheme can be found to have joined the scheme if it knowing and actively participated in that scheme. *Brown v. Donco Enters. Inc.*, 783 F.2d 644, 646 (6th Cir. 1986); *see also*, *In re Se Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 949 (E.D.Tenn. 2008) (interpreting *Brown* as only requiring – at the motion to dismiss stage – short allegations that defendant "participated in, authorized, directed and/or knowingly approved or ratified" the illegal conduct complained of).

Contrary to OILN's contention, NorthStar need not plead facts that "tend[] to exclude the possibility of independent action by the [parties]." Dkt. 23, p. 6; *see also Erie Cnty. v. Morton Salt, Inc.,* 702 F.3d 860, 869 (6th Cir. 2012) at 869 (the tends "to exclude the possibility of lawful, independent conduct" is a standard of proof at the summary judgment – not the pleading – stage of a lawsuit); *Cloverleaf Enterprises, Inc. v. Maryland Thoroughbred, Horsemen's Ass'n, Inc.*, 730 F. Supp. 2d 451, 462 (D. Md. 2010) (holding that "[t]he question in this case is not whether [plaintiff] provided sufficient *evidence* of concerted action, but whether it has made sufficient *allegations* of such action to survive the motion to dismiss stage") (emphasis original). Nor is it necessary for NorthStar to plead "all specific questions about 'who, what, when and where'" as long as the complaint "put[s] defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist." *In re Packaged Ice*

8

*Antitrust Litig.*, 723 F. Supp. 2d 987, 1005-06 (E.D. Mich. 2010) (at the pleading stage, "*Twombly* does not require specific allegations of time, place or person").

Applying the proper *Twombly* standard, an antitrust plaintiff need only plead sufficient facts to plausibly suggest that the defendant purposefully participated in the illicit scheme – such that it is reasonable to expect that discovery *could* show evidence of such participation. *Twombly*, 550 U.S. at 556 (holding that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."); *see also Ohio Willow Wood Co. v. Alps S. LLC*, 2011 WL 1237582 (S.D. Ohio Mar. 29, 2011) (denying motion to dismiss because "discovery *could* yield evidence of fraudulent or anticompetitive conduct by OWW that proves the licensing agreements were made in furtherance of an overall scheme to create a monopoly") (emphasis added); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 783 (N.D. Ohio 2011), *reconsideration denied* (Sept. 15, 2011) (need to allege facts to "raise a reasonable expectation" for discovery of an illegal agreement). So long as it is plausible to suggest the defendant purposefully joined the alleged conspiracy, "[a] claim may survive motion to dismiss even if a judge believes the chances of recovery to be very remote or unlikely." *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012) (citing *Twombly*, 550 U.S. at 557).

Contrary to OILN's assertions otherwise, NorthStar's complaint does not allege that OILN was an unknowing agent – only acting at behest of Chesapeake. Dkt. 23, p. 4. Based even on the limited documents currently available to NorthStar, NorthStar has alleged sufficient facts to infer that OILN knew and actively participated in the illicit scheme, including:

- OILN knew of and was in fact participating in the competitive market for mineral rights in northern Michigan leading up to NorthStar putting its leases out for bid. Dkt. 1, ¶¶ 27-29; Dkt. 1-2, p. 33;

- OILN knew of the desirability of NorthStar's leasehold position and that both Chesapeake and Encana desired to acquire NorthStar's leases. Dkt. 1, ¶¶ 27-28, 30, 32;

- OILN – by no later than June 16, 2010 – knew of the illicit scheme between Chesapeake and Encana, including the directive from McClendon, the CEO of Chesapeake, that it is "time to smoke a peace pipe" with Encana. Dkt. 1, ¶ 37; Dkt. 1-2, p. 31;

- As of July 8, 2010, OILN inked a deal to acquire NorthStar's acreage at a price far less than Chesapeake, OILN, and other buyers had paid for similar Utica/Collingwood acreage at the May 2010 State of Michigan auction. Dkt. 1, ¶¶ 27-30, 37, 41-42, 45;

- Only a week later, on July 16, 2010, OILN noticed "the coincidence" that both Encana and Chesapeake had cut their maximum price per acre by 50%. *Id.*, ¶ 46;

- For the following three months, OILN was involved in reneging on deals Chesapeake had with NorthStar and other landowners, including foisting an extraordinarily, one-sided "liquidated damages" provision on NorthStar. *Id.*, ¶ 50-55;

- At the state auction in October, Encana and Chesapeake did not compete against each other for any acreage sold in the same county and were ultimately able to purchase leases at drastically reduced prices. *Id.*, ¶ 59-61.

Yet, despite being involved in the illicit scheme, OILN did nothing to stop its representation of Chesapeake or to otherwise withdraw itself from participation. *Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) (since "conspiracies are presumptively ongoing, [when, as here,] plaintiff plausibly alleges that defendants acted pursuant to the conspiracy if [allegations include] both (1) a conspiratorial agreement and (2) later actions that are consistent with the conspiracy."); *see also Chiropractic Co-op Ass'n of Michigan v. American Medical Ass'n*, 867 F.2d 270, 274-75 (6th Cir. 1989) (burden is on defendants "to demonstrate withdrawal from the conspiracy."). Instead, OILN continued to stay involved and to commit acts in furtherance of the scheme despite its obviously negative effects on the market.

When, as here, NorthStar has alleged sufficient facts to plausibly infer that OILN's conduct was in furtherance of a known illicit scheme, such allegations are sufficient at the pleading stage to state a plausible explanation for that conduct – namely that OILN purposefully participated in the alleged conspiracy.[3]  *Watson Carpet 648 F.3d* at 457-59 (sufficient to state *a single* plausible basis to infer that one's continued acts were for continued adherence to the conspiratorial plan) (emphasis added); *see also In re Dairy Farmers of America, Inc.*, 2013 WL 212908, *4-7 (N.D.Ill. Jan. 18, 2013 (sufficient to allege concerted acts in furtherance of another's illicit scheme coupled with the "unnatural effect on the market" and an alleged "motive" to join the conspiracy).  That is so – at the pleading stage – even if there appears to be an equally plausible explanation for that conduct.  *Id.* at 457-59 ("ferreting out the most likely reason for the conspirator's conduct is not appropriate at the pleadings stage").

2. **NorthStar Sufficiently Alleged OILN's Acquiescence in the Illicit Scheme.**

"[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."  *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948) ).  *Paramount Pictures* has resulted in a litany of cases – across the circuits – holding that the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion."  *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 973 (7th Cir. 1995); *see also Flinkote Co. v. Lysford, 246 F.2d 368, 374-75* (1968) (in a job-allocation conspiracy in which the supplier to the conspirators "could have acquired knowledge of the conspiracy" . . . and "with such inferred knowledge, participated in the conspiracy, and aided it;" such acts in aid of the conspiracy "would constitute knowing participation.").  In fact, it is not even necessary for one to share an anticompetitive motive in entering into a proscribed restraint so long as one

---

[3] OILN cites *Monsanto v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), for the proposition that the proper standard for a motion to dismiss is that plaintiff must present "evidence that reasonably tends to prove that [each defendant] had a conscious commitment to a common [illicit] scheme."  However, *Monsanto* states a summary judgment standard of review.  *See, Erie Cnty.*, 702 F.3d at 869.

11

acts with knowledge that the restraint would have anticompetitive effects. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541 (4th Cir. 1998).

Under the *Paramount* precedent and the cases it has spawned, OILN was a knowing participant in the Chesapeake/Encana conspiracy. OILN had knowledge (or it can be inferred that OILN had knowledge) of the illicit scheme (as best evidenced by the June 16, 2010 email exchange, Dkt. 1, ¶ 37; Dkt. 1-2, p. 31) and, if not a direct participant in the scheme, certainly acquiesced or aided Chesapeake and Encana in carrying out that scheme. As such, whether by inference of a plausible agreement to join or by acquiescing to participation in the illicit scheme, NorthStar has stated actionable claims against OILN.

### IV. CONCLUSION

Based on the foregoing, NorthStar respectfully requests that this Court deny OILN'S Motion to Dismiss in its entirety.

Dated: June 11, 2013

By: /s/ David R. Whitfield
Brian J. Masternak (P57372)
Charles N. Ash, Jr. (P55941)
Lance R. Zoerhof (P63980)
David R. Whitfield (P73352)
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
bmasternak@wnj.com
cash@wnj.com
lzoerhof@wnj.com
dwhitfield@wnj.com
616.752.2000
Attorneys for Plaintiff