# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| NORTHSTAR ENERGY LLC,<br>A Delaware limited liability company,<br><br>       Plaintiff,<br>v.<br><br>ENCANA CORPORATION,<br>a Canadian corporation, and<br><br>ENCANA OIL & GAS USA INC.,<br>a Delaware corporation, and<br><br>CHESAPEAKE ENERGY CORPORATION,<br>an Oklahoma corporation, and<br><br>O.I.L. NIAGARAN, LLC,<br>a Michigan limited liability company,<br><br>       Defendants. | Case No. 1:13-cv-00200-PLM<br><br>Hon. Paul L. Maloney<br><br>Mag. Judge Joseph G. Scoville<br><br>**REPLY BRIEF IN SUPPORT OF CHESAPEAKE ENERGY CORPORATION'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>**ORAL ARGUMENT REQUESTED** |

_____/

| | |
|---|---|
| Brian J. Masternak (P57372)<br>Charles N. Ash, Jr. (P55941)<br>Lance R. Zoerhof (P63980)<br>David R. Whitfield (P73352)<br>WARNER NORCROSS & JUDD LLP<br>900 Fifth Third Center<br>111 Lyon Street NW<br>Grand Rapids, MI 49503-2487<br>bmasternak@wnj.com<br>cash@wnj.com<br>lzoerhof@wnj.com<br>dwhitfield@wnj.com<br>616.752.2000<br>*Attorneys for Plaintiff NorthStar Energy LLC* | Molly S. Boast<br>Sanket J. Bulsara<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>molly.boast@wilmerhale.com<br>212.230.8800<br><br>Anthony J. Rusciano (P29834)<br>Dennis G. Cowan (P36184)<br>Michael J. Barton (P34509)<br>PLUNKETT COONEY, P.C.<br>38505 Woodward Ave., Suite 2000<br>Bloomfield Hills, MI 48304<br>arusciano@plunkettcooney.com<br>248.901.4000<br>*Attorneys for Defendants Chesapeake*<br>*Energy Corporation and O.I.L.*<br>*Niagaran, L.L.C.* |

_____/

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

    I.    The Complaint Provides No Basis To Infer Any Anticompetitive Agreement, Much Less The Agreement Necessary To Support NorthStar's Claims ................. 2

    II.    NorthStar Has Not Pleaded An Illegal Information Exchange ............................... 6

    III.    The Tortious Interference Claim Against Chesapeake Fails As A Matter Of Law . 9

CONCLUSION ................................................................................................................ 10

# TABLE OF AUTHORITIES

## CASES

Page(s)

**Federal Cases**

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,*
   459 U.S. 519 (1983)..................................................................................................1

*Carrier Corp. v. Outokumpu Oyj,*
   673 F.3d 430 (6th Cir. 2012) ....................................................................................4

*Cason-Merenda v. Detroit Medical Center,*
   862 F. Supp. 2d 603 (E.D. Mich. 2012) ................................................................7, 8

*Continental Cablevision of Ohio, Inc. v. American Electrical Power Co.,*
   715 F.2d 1115 (6th Cir. 1983). .................................................................................7

*First Med Representatives, LLC v. Futura Medical Corp.,*
   195 F. Supp. 2d 917 (E.D. Mich. 2002) ...................................................................2

*Monsanto Co. v. Spray-Rite Service Corp.,*
   465 U.S. 752 (1984)..................................................................................................7

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001) .................................................................................7, 8

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,*
   552 F.3d 430 (6th Cir. 2008) ....................................................................................4

*Worldwide Basketball & Sport Tours, Inc. v. NCAA,*
   388 F.3d 955 (6th Cir. 2004) .................................................................................6, 7

**State Cases**

*Cedroni Associates, Inc. v. Tomblinson, Harburn Associates, Architects & Planners Inc.,*
   492 Mich. 40, 821 N.W.2d 1 (2012).......................................................................10

*Reed v. Michigan Metro Girl Scout Council,*
   201 Mich. App. 10, 506 N.W.2d 231 (1993)............................................................9

## INTRODUCTION

Relying on speculation in newspapers and carefully chosen excerpts from email correspondence, NorthStar Energy LLC ("NorthStar") asks this Court to ignore that its Complaint failed to allege the only agreement that could have caused NorthStar injury: an agreement between Chesapeake Energy Corporation ("Chesapeake") and Encana Corporation ("Encana") that Encana would withdraw from bidding for NorthStar's leases before June 25, 2010.  NorthStar claims in its response that it has alleged this agreement but can point to no passage in the Complaint that does so.  Recognizing that fundamental flaw, NorthStar now claims it has alleged Chesapeake's and Encana's "mutual intent to combine in *some manner or other* to depress prices."  NorthStar's Resp. To Chesapeake's Mot. To Dismiss, Dkt. 27 ("NorthStar Resp.") at 15 (emphasis in original).  Such a vague allegation is insufficient to allege that Chesapeake was party to an anticompetitive agreement.  To try to show otherwise, NorthStar relies on inference piled upon inference from the general impression left by its Complaint, ignoring—and indeed, often obscuring—the specific facts it did allege that suggest no such agreement, broad or specific, was ever reached.  As the Supreme Court has made clear, it is "not . . . proper to assume that [a plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).  Because NorthStar has failed to allege facts sufficient to support a plausible inference of the only agreement that could have caused its injury, all claims against Chesapeake should be dismissed.[1]

---

[1] *See* Reply Brief In Support Of O.I.L. Niagaran, L.L.C.'s Motion To Dismiss ("OILN Reply") at 1-2 (articulating pleading standard).  Chesapeake hereby incorporates by reference all of the OILN Reply.

1

## ARGUMENT

I.  **The Complaint Provides No Basis To Infer Any Anticompetitive Agreement, Much Less The Agreement Necessary To Support NorthStar's Claims**

NorthStar concedes—and Chesapeake agrees—that "[t]he only dispute" in this case "is whether Chesapeake and Encana agreed [that Chesapeake would bid for NorthStar's leases and Encana would not], or acted independently."  NorthStar Resp. at 1.[2]  Any other alleged conspiracy that began or continued after NorthStar's June 25 bidding deadline could not have caused an anticompetitive injury to NorthStar, because it chose to close bidding on that date.  *See id.* at 17.[3]  Because "[p]laintiff's injury" must "flow[] from a competition-reducing (i.e., anticompetitive) aspect of the challenged act," the Complaint must allege that the challenged act caused the injury.  *See First Med Representatives, LLC v. Futura Med. Corp.*, 195 F. Supp. 2d 917, 924-25 (E.D. Mich. 2002) (cited by NorthStar Resp. at 18).  As a result, only an agreement before June 25 about bidding for *NorthStar's* leases could have harmed NorthStar in the manner it now claims.  NorthStar's alleged injury could not have flowed from "a wide-ranging pattern of anticompetitive activity" (NorthStar Resp. at 19); it could only have resulted from an "agree[ment]" that Encana would not submit a bid on June 25, rather than the parties acting "independently."  *See* NorthStar Resp. at 1.

---

[2] NorthStar rather incredibly argues later in its Response that NorthStar need not "demonstrate that Chesapeake and Encana actually entered into a specific agreement that caused NorthStar the injury it claims to have suffered as a result of the alleged antitrust violation."  NorthStar Resp. at 14 (internal quotation marks omitted).  Other than splitting hairs about cited authorities, NorthStar offers no reason why it would not have to demonstrate that it has plausibly pleaded the existence of this agreement, which it concedes on the first page of its brief is the "only dispute" in the case.

[3] For example, if the Complaint plausibly alleged an agreement to divide bidding responsibility for the October 2010 state lease sale (which it does not), that agreement could not have harmed NorthStar.  Even if that agreement had an ancillary effect on lease prices in the area *in October*, NorthStar had long since taken its leases off the market.

2

Recognizing this as the only basis on which to survive Chesapeake's motion, NorthStar *says* that it has alleged such an agreement. *See id*. at 6. But it has not. In support of its assertion, NorthStar does not cite the Complaint—because the Complaint does not allege this agreement—but instead cites a June 25, 2012 Reuters article, which purports to describe preliminary suggestions that Chesapeake and Encana should discuss "who should handle" NorthStar. Compl., Ex. I, Dkt. 1-2, at 36. Yet the Reuters article does not claim that Chesapeake and Encana reached an agreement that Encana would not bid for NorthStar's acreage, or about any other leasehold for that matter. *See id.* at 34 ("One unanswered question is whether Chesapeake and Encana consummated any collusive agreements.").

On June 22, 2010, Encana circulated a draft letter of intent ("LOI") describing the terms of a potential agreement—and assigning Encana responsibility for bidding on NorthStar's leases—but NorthStar concedes (NorthStar Resp. at 15, 17) that this draft LOI is not the "broader" "illegal agreement" on which it bases its claims. If the June 22 draft LOI is not the agreement, NorthStar's claim is plausible only if there was an agreed-upon switch after the draft LOI was circulated pursuant to which Chesapeake, not Encana (as the draft LOI required), bid for NorthStar's acreage. But the Complaint does not allege such a switch. Furthermore, the Complaint actually shows that no switch occurred: the day after Encana circulated the draft LOI, it withdrew from bidding for NorthStar's leases. Compl., ¶ 40. There was not a second draft LOI; nor does NorthStar cite or allege any conversations or emails between Chesapeake and Encana suggesting that such a switch was contemplated, let alone any conversations and emails between June 22 and the following day agreeing to such a switch.

In an attempt to gloss over the absence of such allegations, NorthStar claims (NorthStar Resp. at 17) that the Complaint "expressly pleads a broader agreement" (of which the switch

3

agreement must have been a part) to depress Michigan lease prices.  NorthStar, however, never provides any details about the contours of this broader agreement, including what the parties agreed to do.  It simply says the parties intended to combine "in *some manner or other*."  NorthStar Resp. at 15.  NorthStar thus has engaged in the prohibited practice of conclusory pleading.  To survive a motion to dismiss, allegations of an explicit agreement in violation of Section 1 "must be specific enough to establish the relevant who, what, where, when, how or why."  *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 445 (6th Cir. 2012) (quotation marks and citations omitted); *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) ("[P]laintiff [must] allege the existence of the [Section 1] conspiracy in more than vague and conclusory terms.").

NorthStar cites only three alleged facts that it says support an inference that Encana's June 23 withdrawal resulted from an agreement with Chesapeake on terms different from those articulated in the June 22 LOI: (1) a June 15 email floating the idea of assigning responsibility for NorthStar; (2) a June 16 internal Chesapeake log entry stating that Mr. McClendon did not want to compete with Encana; and (3) a June 16 email discussing deep rights holders generally, but not NorthStar specifically.  *See* NorthStar Resp. at 15; *see also id.* at 15 n.8 (citing emails before June 22).  None of these emails—which describe early stage negotiations and nothing close to a final agreement—provides any support whatsoever for the inference that a switch of responsibility occurred between June 22, when Encana circulated the draft LOI listing itself as the party responsible for NorthStar, and June 23, when Encana decided to withdraw from the bidding process.[4]  NorthStar also relies (NorthStar Resp. at 6) on a June 25 internal Chesapeake

---

[4] Similarly, the suggestion that an agreement had been reached with respect to the October state sale has no bearing on NorthStar's claim.  Any agreement reached in October (presumably at some point after October 20, when the Complaint alleges Chesapeake and Encana

4

log entry, created two days *after* Encana had withdrawn, noting that a Chesapeake official was still "continu[ing] to work on a deal with Encana." *See* Compl., ¶ 38. But whatever that future deal could entail, the entry shows the parties had not reached an agreement at that time because they were still competing "to push the price up." *Id.*[5]

In fact, taken altogether, the Complaint's allegations make it implausible to infer that Encana decided to withdraw from bidding for NorthStar's leases based on an agreement with Chesapeake, as opposed to some other unilateral reason (such as the discovery that the Utica/Collingwood shale was not commercially viable). *See* Br. In Support Of Chesapeake's Mot. To Dismiss, Dkt. 19 ("Chesapeake Br.") at 17-18. On the morning of the NorthStar bidding deadline, and two days after Encana had withdrawn, Chesapeake was still evaluating the draft LOI internally. Compl., ¶ 38; Compl., Ex. G, Dkt. 1-2, at 2. With that draft LOI in hand and no alleged reason to believe Encana would not bid, Chesapeake submitted its own bid. The obvious and only explanation for this behavior is that Chesapeake did not know Encana had withdrawn, and Chesapeake bid to protect its own interests. *See* Chesapeake Br. at 16-17.

The July 19, 2010 email exchange quoted in the Complaint (Compl., ¶ 46) also makes it implausible to infer an agreement. That exchange shows that Chesapeake first learned from public sources (blog posts) about Encana's decision to "stop[] all leasing." *See* Boast Decl., Ex.

---

were still "working . . . on arranging a bidding strategy," Compl., ¶ 58) could not possibly have harmed NorthStar, whose bidding had been closed for months at that point. *See* Chesapeake Br. at 14.

[5]Appropriately, NorthStar has abandoned any argument that negotiations over a Purchase and Sale Agreement (PSA) in the months following NorthStar's acceptance of Chesapeake's bid could lead to the inference that Chesapeake and Encana had agreed Encana would not bid for NorthStar's leases. *See* NorthStar Resp. at 12-19 (arguing that NorthStar had pled the necessary agreement without mentioning the PSA negotiations). These negotiations—including the fact that Chesapeake accepted NorthStar's counterproposal of a different outline of terms—support the inference that Chesapeake had not reached an agreement with Encana. *See* Chesapeake Br. at 13-14.

B, Dkt. 19-3, at 8.[6] Surprised by this news, Chesapeake sought and received from Encana confirmation of what blog posters had said: "I was told that everything is on hold indefinitely for them"; "I was told by Encana directly . . . [that] they were stopping all leasing." *Id.* at 4, 8. This is precisely what Encana repeated back to Chesapeake: "We have decided to discontinue further leasing at this time." *Id.* at 3 (Encana's Wojahn to Chesapeake's McClendon). The exchange, which occurred almost one month *after* NorthStar's bidding deadline, demonstrates that Encana was unwilling to provide any further information to Chesapeake, including any inside information about why it was withdrawing. In short, Encana told Chesapeake the same public story that it told landowners.[7]

In sum, NorthStar neither alleges an agreement for Encana not to bid nor provides a basis from which to infer such an agreement. To the contrary, the Complaint's specific allegations demonstrate the exact opposite: the parties never reached an agreement that led to a switch. In the absence of this agreement, all NorthStar's claims should be dismissed. *See* Chesapeake Br. at 2.

## II.    NorthStar Has Not Pleaded An Illegal Information Exchange

Alleging an information exchange as anticompetitive conduct does not alleviate NorthStar's burden under Section 1 of the Sherman Act of establishing that defendants "participated in an agreement" that "unreasonably restrained trade." *See Worldwide Basketball*

---

[6] NorthStar complains (NorthStar Resp. at 11) that the Boast Declaration should be disregarded because the emails attached to it are "incomplete on their face." NorthStar misapprehends the emails' significance. *See* OILN Reply at 8 n.5 (discussing Boast Declaration).

[7] This is simply not an email exchange that would have been sent between two parties that had already reached an agreement to coordinate leasing. Even in the unlikely event Mr. McClendon initially forwarded this email because he was not "in the loop" (NorthStar Resp. at 16), as NorthStar contends, that would be more reason for Mr. Wojahn to respond with inside information, rather than with the party line that Encana was feeding all landowners.

*& Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 959 (6th Cir. 2004); *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983) (information exchange does not violate Section 1 without "evidence of an actual agreement to restrain competition"). The cases NorthStar cites confirm this point. *See* NorthStar Resp. at 19-20.[8]

In *Todd v. Exxon Corp.*, the plaintiff did not allege an actual agreement to fix wages (a *per se* violation), but the court concluded that defendants' detailed and systematic exchange of wage information supported an inference of an agreement to share information that "would be used in setting the salaries of [defendants'] employees." 275 F.3d 191, 196 (2d Cir. 2001). Similarly, in *Cason-Merenda v. Detroit Medical Center*, the plaintiff alleged a *per se* "conspir[acy]" to "depress the level of compensation paid to" registered nurses in Detroit-area hospitals and a separate "scheme" to exchange wage information. 862 F. Supp. 2d 603, 606 (E.D. Mich. 2012). In both cases, there was no suggestion that the plaintiff did not have to meet Section 1's ubiquitous "agreement" requirement.

NorthStar claims in its response that, as in *Todd* and *Cason-Merenda*, it has alleged "a continuing *agreement* to exchange competitive information." NorthStar Resp. at 19 (emphasis added). It has not. There is no suggestion that the parties conspired to exchange, for example, pricing information or information about each company's highly proprietary geological research, nor does NorthStar allege the systematic exchange of confidential information from which such an agreement could be inferred. *Cf. Todd*, 275 F.3d at 196 (defendants allegedly "periodically conducted surveys comparing past and current [] salary information and participated in regular

---

[8] NorthStar's suggestion (NorthStar Resp. at 19) that Chesapeake does not recognize that information exchanges may constitute separate Section 1 violations is misguided. Chesapeake (Chesapeake Br. at 18-19) simply makes the obvious point that to allege that an information exchange violates Section 1, NorthStar first must establish an underlying agreement because Section 1 does not prohibit "[i]ndependent action." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).

meetings at which current and future salary budgets were discussed"); *Cason-Merenda*, 862 F. Supp. 2d at 606-15 (plaintiffs alleged "scheme of exchanging compensation-related information" that included "quarterly [wage] surveys," regular requests for wage information, and wage discussions at industry meetings). The Complaint alleges only that negotiations between Chesapeake and Encana about sharing leasing responsibility were ongoing but never finalized; it does not allege anything suggesting an agreement to share confidential information.

Even if NorthStar had pleaded facts suggesting an agreement to exchange information existed, the type of information allegedly exchanged is not the kind that can sustain a Section 1 claim. As NorthStar concedes, the exchange of information can be unlawful under the rule of reason only if the exchange itself has an anticompetitive effect. NorthStar Resp. at 20. The allegedly "confidential" information exchanged between the parties during the course of the negotiations about a different (never consummated) agreement amounted to nothing more than constantly changing ideas about which company might be responsible for leasing in which counties. *Cf.* NorthStar's Resp. To Encana's Mot. To Dismiss, Dkt. 26 ("NorthStar Resp. to Encana") at 14-15. This is not the kind of information that can itself have an anticompetitive effect, and NorthStar fails to explain how it could. *Cf., e.g.*, *Todd*, 275 F.3d at 211 ("[e]xchanges of current price information . . . have the greatest potential for generating anti-competitive effects") (citation omitted); NorthStar Resp. at 19-20 (failing to provide any details regarding anticompetitive effect of exchanging lease allocation information). Significantly, NorthStar does not contend that any of the information allegedly exchanged caused its alleged antitrust injury here. *See* NorthStar Resp. at 15 (basing claim on alleged agreement not to bid, not information exchange).

For these reasons, Counts II and IV should be dismissed.

**III.     The Tortious Interference Claim Against Chesapeake Fails As A Matter Of Law**

In response to arguments that its alleged "business expectancy" was too vague to support a claim for tortious interference (*see* Chesapeake Br. at 20-21; Br. In Support Of Encana's Mot. To Dismiss, Dkt. 17, at 22-23), NorthStar identifies one expectancy in its response to Encana's motion and a different one in response to Chesapeake's.[9]  In response to Encana's motion, NorthStar asserts that it had a "reasonable probability of selling its acreage to Encana, Chesapeake, or another prospective buyer [at a competitive price]."  NorthStar Resp. to Encana at 22-23.  If this is the alleged expectancy, the claim fails against Chesapeake.  As NorthStar acknowledges (NorthStar Resp. at 20), Chesapeake cannot be held liable for tortious interference with a business expectancy to which it is a party.  *See* Chesapeake Br. at 19-20 (citing *Reed v. Michigan Metro Girl Scout Council*, 201 Mich. App. 10, 13, 506 N.W.2d 231, 233 (1993) (tortious interference defendant must be a "third party" to the business relationship)).

Presumably to avoid this complete defense, NorthStar changes its position in response to Chesapeake's motion and says that its claim is based only on the expectation that Encana would have bid but for Chesapeake's alleged interference.  NorthStar Resp. at 20-21.  But by putting its acreage up for bid, NorthStar could not create a legally cognizable expectancy that any specific company (*e.g.*, Encana) would submit a bid.  NorthStar fails to explain why it could have expected Encana to bid any more than it could have reasonably expected a bid from any other company.  *See id*. at 20-21.  That Encana signed up to view the details of NorthStar's offerings by signing a confidentiality agreement, Compl., ¶ 32, surely does not establish this "reasonable

---

[9] The description of the business expectancy in both briefs abandons any theory of tortious interference with the July 8 agreement.  *See* NorthStar Resp. at 21-22; NorthStar Resp. to Encana at 22-23.  As NorthStar concedes, Chesapeake could not, in any event, tortiously interfere with the July 8 agreement if OILN signed that agreement as Chesapeake's agent.  As explained in OILN's Reply (at 4-6), the Complaint alleges the OILN was Chesapeake's agent.

probability." As the Complaint acknowledges, several buyers expressed interest, and Atlas Gas & Oil Company also signed a confidentiality agreement with NorthStar but did not place a bid on June 25. Compl., ¶¶ 30, 31, 41. Similarly, even if Encana had bid, NorthStar had no reasonable or specific expectation as to the terms of that bid and how they would compare with what Chesapeake offered. NorthStar Resp. at 21. A valid business expectancy "must be a reasonable likelihood or probability," but NorthStar's supposed expectation, which is supported only by the conclusory allegation that Encana would have bid, is "mere wishful thinking." *Cedroni Assocs., Inc. v. Tomblinson, Harburn Assocs., Architects & Planners Inc.*, 492 Mich. 40, 45, 821 N.W.2d 1, 3 (2012).[10]

## CONCLUSION

For the foregoing reasons, the Complaint against Chesapeake should be dismissed with prejudice.

Respectfully submitted,

WILMER CUTLER PICKERING HALE AND DORR LLP
*Attorneys for Defendants Chesapeake Energy Corporation and O.I.L. Niagaran, L.L.C.*

Dated: June 25, 2013

By: /s/ Molly S. Boast
Molly S. Boast
Sanket J. Bulsara
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212.230.8800
molly.boast@wilmerhale.com

---

[10] NorthStar's secondary liability claims for civil conspiracy and concert of action (Count VI) must fail because, as described above, NorthStar has failed to allege underlying wrongful conduct. *See* Chesapeake Br. at 23.